*To Be Argued by Michael H. Sussman*

# 23-1018

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
--------------------------------------------------------

YOLANDA D. TYSON,

*Plaintiff-Appellant,*

v.

TOWN OF RAMAPO; CHRISTOPHER ST. LAWRENCE, as Town Supervisor, Individually; YITZCHOK ULLMAN, as Councilman, Individually; SAMUEL TRESS, as Councilman, Individually; BRENDEL CHARLES, as Councilwoman, Individually, A/K/A BRENDEL LOGAN; PATRICK J. WITHERS, as Councilman, Individually; BRAD R. WEIDEL, as Chief of Police, Police Department Twon of Ramapo, Individually; PETER F. BROWER, as Former Chief of Police, Police Department Town of Ramapo, Individually; THOMAS COKELY, as Captain, Police Department Town of Ramapo, Individually,

*Defendants-Appellees.*

--------------------------------------------------------

**On Appeal from an Order and Judgment of the**
**United States District Court for the Southern District of New York**

---

## APPELLANT'S REPLY BRIEF

---

SUSSMAN & GOLDMAN
*Attorneys for Plaintiff-Appellant*
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991 [Tel.]
(845) 294-1623 [Fax]

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ...........................................................................................2

    <u>Point I</u>

    A reasonable jury could find that Tyson was fired under
    circumstances giving rise to an inference of discrimination ..........................2

    <u>Point II</u>

    A reasonable jury could find that s' asserted legitimate
    reason for firing Appellant is pretextual........................................................20

CONCLUSION........................................................................................22

CERTIFICATE OF COMPLIANCE .......................................................23

# TABLE OF AUTHORITIES

**Cases**

*Austin v. Ford Models*,
    149 F.3d 148 (2d Cir. 1998) ............................................................3, 4, 9, 22

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000) ...............................................................20, 21, 22

*Holtz v. Rockefeller & Co.*,
    258 F.3d 62 (2d Cir. 2001) ...................................................................11, 12

*King v. Twon of Wallkill*,
    302 F.Supp.2d 279 (S.D.N.Y. 2004) ............................................................19

*Matter of Stewart v. County of Albany*,
    300 A.D.2d 984 (3d Dep't. 2002)..............................................................6, 10

**Statutes**

N.Y. Civ. Serv. L. § 71 .................................................................................*passim*

N.Y. GML § 207-c ........................................................................................*passim*

N.Y. Workers' Comp. L. § 2(15)...................................................................5

N.Y. Workers' Comp. L. § 10(1).................................................................5, 6

**Administrative Decisions**

*Matter of Village of Wappingers Falls v. PBA of Wappingers Falls*,
    54 PERB P4559 (Nov. 22, 2021) ...................................................................6

## PRELIMINARY STATEMENT

In her opening brief, Tyson demonstrated that Appellees routinely provided Caucasian and male officers light duty assignments when their injuries prevented them from returning to full duty status and that, had she been similarly accommodated, she would not have been absent for more than one year due to her injuries and, thus, not terminable under Civil Service Law § 71. As such, a reasonable jury could find that, by using discriminatory means to create the predicate for her termination, Appellees' termination of Tyson was also discriminatory.

Tyson now respectfully submits this reply brief in further support of her appeal. Appellees' opposition brief only highlights their failure to eliminate all genuine factual disputes and to establish their entitlement to judgment as a matter of law, as was their burden in moving for summary judgment. It also further highlights the disparate treatment to which they subjected Tyson. For instance, Appellees do not dispute that Officer 2, a Caucasian male, was permitted to work light duty from November 17, 2008 to December 30, 2017 – a period of *nine years*, much of which overlapped with the time period during which Tyson was not provided this accommodation, namely from early 2014 and thereafter. And, as demonstrated below, their legal arguments are misplaced and otherwise fall short.

In sum, since a reasonable jury could return a verdict for Tyson on this record, the district court's judgment dismissing the action should be reversed and vacated and the matter remanded for trial.

## ARGUMENT

### Point I

**A reasonable jury could find that Tyson was fired under circumstances giving rise to an inference of discrimination.**

Appellees first argue that Tyson has "made her claim a moving target," and that the only issue on this appeal is whether the decision to terminate her was discriminatory. *See* Resp. Br. at 24-25.  But Tyson's arguments to the district court in opposing summary judgment, and now on appeal, have remained consistent and they *do* focus on her termination – she argues that, based upon Appellees' disparate treatment of her as compared to her Caucasian male peers, who were provided long-term light duty assignments that enabled them to remain at work despite their injuries and, thus, not terminable under Section 71, Tyson's termination occurred under circumstances giving rise to inference of discrimination.  Put differently, by discriminating against Tyson in their refusal to provide her with light duty assignments, Appellees discriminatorily created the necessary condition by which they were then able to terminate her under Section 71, thereby rendering the termination itself discriminatory.

This Court has recognized such a theory of discriminatory termination – that is, where unlawful discrimination creates the circumstance leading to termination, rendering the termination itself discriminatory. *See Austin v. Ford Models*, 149 F.3d 148, 154-55 (2d Cir. 1998). In *Ausitn*, the plaintiff alleged that her employer discriminated against her on the basis of race and age by failing to pay her overtime and to provide her additional staffing, whereas it paid overtime and provided additional staffing to similarly situated Caucasian and younger employees. *See Id.* at 151, 152-54. Because she lacked additional staffing and refused to work extra hours without overtime pay, she was unable to keep up with her work, creating a backlog and crisis in her department, for which her employer fired her. *See Id.* She alleged that her termination was discriminatory.

In reversing the district court's dismissal of the plaintiff's discriminatory termination claims, this Court recognized that, to the extent the crisis for which the defendant fired plaintiff resulted from her refusal to work under discriminatory conditions, the ultimate reason for the termination could itself be deemed discriminatory. *See Id.* at 155. It explained:

> Austin's pleadings admitted that she stopped working "extra hours" in January 1994 and that as a result of Ford's "failure to make the necessary adjustments to her workload, the cashflow in the company suffered and crisis developed." Austin also acknowledged that, as early as September 1993, her supervisors had "continuous complaints" about the pace at which she was performing her job. In many cases, such admissions by a plaintiff

would be sufficient to establish that an employer fired an employee for a legitimate, non-pretextual, non-discriminatory reason. However, in the context of Austin's allegations of discrimination as to overtime and staffing allocation, her statement that she refused to work "extra" or overtime hours without pay can be construed as a refusal to comply with working conditions of employment prohibited by Title VII and the ADEA. *If indeed Ford denied Austin overtime pay because of her race and denied Austin equal staffing assistance because of her age, then it would plainly be discrimination for Ford to fire Austin for refusing to work unpaid overtime hours without an assistant.*

*Id.* at 155 (alteration accepted) (emphasis added).

Likewise, here, if, indeed Appellees refused to provide Tyson with light duty assignments, which would have enabled her to remain in the workplace, because of her race and/or gender, then it would plainly be discrimination for them to fire her because of her continued absence from work for more than one year under Section 71. Again, this is the argument Tyson made in opposition to summary judgment below and now on appeal. And, under *Austin*, Tyson's focus on light duty to explicate why her termination was discriminatory is appropriate and, indeed, is done to advance her termination claim.

Appellees next argue it is impossible to find sufficient similarity between Tyson and her proposed comparators. *See* Resp. Br. at 27-31. But they are mistaken, and their asserted bases of dissimilarly misplaced.

*First*, Appellees contend that "Tyson cannot rely on any comparators that predate 2016, because those officers were subject to a different set of policies on termination for extended sick leave." Resp. Br. at 28. Appellees point to a Memorandum of Agreement ("MOA") entered in 2016 by and between the Town and police union, which they characterize as providing the circumstances by which "the Town could terminate under Civil Service Law § 71 officers who remained out on leave for more than a year without line of duty injury (GML 207-c)" *Id.* at 28-29. But Appellees misapprehend and mischaracterize the scope of the MOA and its import to the comparator analysis.

Initially, Appellees' characterization of the MOA as applying only to officers out of work due to non-LODI injuries is inaccurate. Indeed, by its very terms, the MOA applies in circumstances where "the Town seeks to separate a member of the PBA (hereinafter "employee") from employment *based upon a disability resulting from occupational injury or disease as defined in the workmen's compensation law* ("Qualifying Injury") where such employee has been absent from duty for more than one year cumulatively ("Qualifying Leave") . . . ." (JA-700). And, of course, the workman's compensation law applies to injury or disease sustained *in the course of one's employment. See* N.Y. Workers' Comp. L. § 2(15) (defining "occupational disease" as "a disease resulting from the nature of employment *and contracted therein.*" (emphasis added)); *Id.* § 10(1) (providing that a covered employer must

"secure compensation to his employees and pay or provide compensation for their disability or death from injury *arising out of and in the course of the employment . . . .*" (emphasis added)).[1]

Since a LODI (or GML § 207-c) injury is one sustained in the line of duty, it is necessarily an "occupational injury or disease" as defined by the workmen's compensation law, and so, by its very terms, the MOA applies to such officers absent from work due to LODI injuries. Of course, such application would be consistent with the general rule in New York that a municipality may properly terminate an officer under Section 71 even if she is receiving GML § 207-c benefits. *See Matter of Stewart v. County of Albany*, 300 A.D.2d 984, 985 (3d Dep't. 2002) ("Upon our review of Civil Service Law § 71 and its legislative history, we find it clearly within the Sheriff's authority to avail himself of the termination procedures therein outlined to remove a disabled correction officer – even one receiving [GML] § 207-c benefits – from the County payroll."); *See also Matter of Village of Wappingers Falls v. PBA of Wappingers Falls*, Case Nos. U-37285, U-37295, 54 PERB P4559 (Nov. 22, 2021) (addressing proposed contractual provision governing Section 71 terminations similar to MOA here and holding same does not violate public policy underlying

---

[1] The term "occupational injury" is not separately defined by the New York Workers' Compensation law, but, presumably, in using such term, the MOA refers to the scope of Section 10(1) of the Workers' Compensation Law, providing for compensation to employees disabled or killed by "an injury arising out of and in the course of the employment."

GML § 207-c, citing cases holding that municipalities may terminate under Section 71 employees receiving GML 207-c benefits).

In any event, the MOA changed nothing about the Town's ultimate authority to terminate employees under Civil Service Law § 71 because that law existed well before 2016 and, itself, dictated when and how employers could discharge civil servants medically absent from employment for more than a year. *See* N.Y. Civ. Serv. L. § 71. Thus, contrary to Appellees' assertion, it was not the MOA that provided the Town the authority to terminate injured officers absent for more than one year, it was Section 71 that provided this authority. And, other than essentially restating Section 71's essential terms, all the MOA really added to the process was to provide specific timelines for notice of such terminations and to clarify that, when the Town contests an employee's Workers' Compensation application, the employee's absence from work does not count as Qualifying Leave time unless and until the application is decided in her favor, at which time the prior period of absence is retroactively deemed Qualifying Leave (JA-700 ¶¶ 2-3). Appellees point to nothing in the record to suggest that, before the MOA, it lacked the authority to terminate disabled officers under Section 71, whether or not the officer was on LODI or GML-207-c status.

And, perhaps more critically and relevant to Tyson's specific arguments here, General Order No. 705 allowed for the provision of light duty assignments for

officers with non-LODI injuries both before and after the MOA was adopted in 2016 (JA-1153 ¶ J(1)).  Thus, irrespective of Appellees' ability to terminate under Section 71 an officer absent for more than a year due to injury, undisputedly, if an officer were accommodated with a light duty assignment, as permitted under General Order No. 705, she would not have been absent and, thus, not terminable under Section 71 or the MOA.  Also absent from the record is any testimony by any Town official suggesting that they deemed the MOA to have materially changed circumstances or otherwise considered same to provide a material basis of distinction as between Tyson and her comparators.  As such, at the very least, the relative importance of the MOA to the decision-making process here – and, thus, whether the MOA constitutes a material basis of distinction as between Tyson and her comparators – presents a question of fact that must be resolved by a jury.

In short, the MOA is a red herring, and certainly not dispositive of the question of whether Tyson was similarly situated to her comparators.  And, in any event, many of Tyson's comparators span beyond 2016.  For instance, Officer 2 was on light duty for nine years, from November 2008 through December 2017; Officer 4 was on leave for at least six years on GML 207-c status from June 2011 to December 2017 and then allowed to work light duty in the records office starting in July 2019 (his status from December 2017 to July 2019 is not clear from the record); Officer 6 was given light duty from August to December 2016 (though he was out for much

of this time) and then missed over 200 days of work from January 2018 through December 2019 before Appellee allowed him to retire in lieu of termination.

*Second*, Appellees assert that "many of the comparators applied for benefits to different decision-makers," and they cite as examples the fact that Officers 6, 8 and 9, applied to different police chiefs for GML 207-c benefits. *See* Resp. Br. at 29. But this is irrelevant. Whether or not some of the comparators applied to different chiefs for GML 207-c benefits has no bearing on whether the Town failed to provide Tyson with light duty assignments because of her race or gender.

*Third*, Appellees contend that "there is no evidence Board members who decided to terminate Tyson ever had to decide whether to terminate any other officer for similar reasons." *See* Resp. Br. at 29. Again, irrelevant. The question is not whether the Appellee Board members had to decide whether or not to terminate a Caucasian or a male who was absent from work for more than a year due to disability (whether LODI or not); rather, the question is whether Appellees discriminatorily denied Tyson the ability to remain in the workplace on a light duty assignment, which would have avoided her continued absence and, thus, prevented her from being terminable under Section 71. *See Austin*, 149 F.3d at 154-55.

*Fourth*, Appellees attempt to defend the district court's holding that Tyson abandoned her argument that she was similarly situated to any officer other than Officer 6, *see* Resp. Br. at 29-30; however, they do not address the arguments set forth in her opening brief (and not repeated herein) as to why the district court's holding in this regard was erroneous. *See* App. Br. at 14-16. Tyson incorporates those arguments herein by reference, which demonstrate that she amply addressed the other comparators and, more critically, that she argued vigorously below why GML 207-c status does not dispositively distinguish her from any other comparator for purposes of a disparate treatment analysis.

*Fifth*, Appellee's contention that Officers 1-5 and 7-11 are dissimilar to Tyson because "they all had GML 207-c job protections that Tyson did not have when she was terminated" fails because this status does not render these officers materially different from Tyson as a matter of law. Indeed, Appellees do not dispute that General Order No. 705 allows for the provision of light duty assignments to injured officers irrespective of LODI or non-LODI status. Moreover, as noted above, the comparators were just as terminable under Section 71 as Tyson despite their receipt of GML § 207-c benefits. *See Matter of Stewart*, 300 A.D.2d at 985.

In other words, Tyson was similarly situated to these officers despite their GML 207-c status because, like them, under General Order No. 705, light duty

assignments were also available to her, and, like her, these officers were also subject to termination under Section 71 should they be absent for more than a year.

Moreover, on summary judgment, it was Appellees' burden to demonstrate the absence of any material factual disputes, including the absence of any factual question as to the why GML § 207-c status may have mattered. Notably absent from the record, however, is any testimony by any defendant or relevant decision-maker explaining why they might have considered such status material. Instead, Appellees rely upon their faulty legal conclusions and misapprehension of the 2016 MOA and of General Order No. 705. Since nothing about the law or these written policies necessarily renders GML 207-c status distinct, at the very least, this raises a question of fact as to comparator analysis.

Appellees next contend that Officer 6 was the only other officer similarly situated to Tyson and that he was not treated any differently. *See* Resp. Br. at 31-32. But they do not respond to what Tyson pointed out in her opening brief – that Officer 6 had been provided light duty before ordered to return to full duty. It was only after he failed to work for more than a year while ordered to be on full duty that the Town separated his employment and, even then, it allowed him to stay on for several more months so that he could retire with full-service retirement. By contrast, though Tyson qualified for light duty, the Town failed to provide her this accommodation.

Appellees argue that Tyson "has not cited any admissible evidence that she actually requested light duty," and assert that their "policies do not create an entitlement to a light duty assignment. *See* Resp. Br. at 33 (citing SA-11-12). But the record amply supports the conclusion that Appellees were aware of her need for, and ability to work, light duty assignments. Specifically, the stipulated Statement of Facts used at Tyson's arbitration proceeding makes several references to doctor's notes indicating her ability to work light duty assignments:

> January, 2014: Note provided to department from Dr. Livingston stating that Tyson may return to work – desk duty only.

> January 14, 2014: Dr. Livingston advises that Tyson may return to transitional duty . . . .

> \* \* \* \* \*

> June 19, 2014: Tyson undergoes an IME with Dr. Michael Miller (Nyack, NY). Result of IME indicate[s] Tyson is unable to return to fully duty and cannot lift anything greater than 50 pounds. Report indicates Tyson can work full-time in an administrative or clerical position . . . .

(JA-310-11). Tyson also averred in her Affidavit opposing summary judgment that Appellees "refused to continue to accommodate me even though my doctor made clear my [ability] to fill such an [light duty] assignment in the spring 2015 and I needed for the same" (JA-1139 ¶ 4).

In any event, under General Order No. 705, "[u]pon notification by the Town's medical authority that a member of the department absent from work who

has alleged a non-line of duty injury . . . is capable of performing specified modified duty, the Chief of Police may direct the employee to report to work to perform such temporary duty . . . ." (JA-1153 ¶ J(2)).  In other words, under departmental policy, there was no requirement to specifically request light duty; rather, the Town is permitted to act based upon the information it receives; and here, the record show that it was aware of Tyson's ability to work light duty.

As for its assertion that its "policies do not create an entitlement to a light duty assignment," *see* Resp. Br. at 33, this is true is far as it goes.  But Tyson does not argue that she was entitled to a light duty assignment or that Appellees were required to provide her one at all costs.  Rather, she points to evidence demonstrating that (1) departmental policies did not limit such assignments only to officers on LODI (GML 207-c) status; (2) she was capable of working such an assignment; and (3) given the department's provision of long-term – indeed, years' long – light duty assignments to other officers, the Town would be hard pressed to argue that providing such an assignment was unavailable or would cause it an undue burden.

This evidence, along with the fact that Caucasian male officers who could not perform full duty work due to their injuries were provided routinely provided light duty assignments during the time period she was not, was sufficient at the summary judgment stage to create genuine issues of fact as to whether she was denied such light duty assignments due to her race or gender.  Again, notably absent from the

13

record is any testimony by any Town official or decision-maker explaining why Tyson was not given a light duty assignment. A jury must resolve this ultimate issue.

Appellees next claim that "Tyson *admitted* in the district court briefing that only officers on GML 207-c status pending GML 207-c status (which she was not) are eligible for transitional duty." *See* Resp. Br. at 33 (emphasis in original). This assertion is inaccurate and misleading. To support this assertion, Appellees cite to a portion of the Local Rule 56.1 Statement. *See Id.* (citing JA-718). At Paragraph 68 on that page, Appellees asserted, and Tyson responded, as follows:

> 68. Transitional duties are assigned to Officers who are on disability leave with GML-c [sic] status.

> [RESPONSE:] ADMIT but the law requires light duty to be provided to all officers who are capable of returning to light duty regardless of the etiology of their injury.

(JA-718 ¶ 68 [internal exhibit citations omitted]). Tyson's response is not an admission that *only* officers on or pending GML 207-c status are eligible for transitional duty because the stated fact does not make this assertion. Rather it simply assets that such officers *are* assigned such duties. But the fact that transitional duties *are* given to officers on GML 207-c status does not necessarily mean that they are the *only* officers to whom such duties are [or can be] given.

To read Tyson's response the way Appellees suggest would be like reading the sentence "my sandwich contains ham" as meaning that my sandwich contains *only* ham and not also cheese. But this would be an improper interpretation because

14

the mere fact that my sandwich *does* contain one item does not necessarily mean that it does *not* contain anything else; likewise, the mere fact that transitional duties *are* given to officers on GML 207-c status does not necessarily exclude the possibility that such duties are [or can be] given to others.

And, if there were any question as to whether Tyson's response constitutes an admission that *only* officers on GML 207-c status are assigned transitional duties, such is dispelled by the balance of her response, which notes that the law requires the provision of light duty regardless of the etiology of one's injury. In other words, Tyson's response makes clear her contention that light duty must be provided to all injured officers capable of performing same, regardless of how or where they are injured, and thus her dispute of any contrary assertion.

But even if Tyson's response could be construed as an "admission" that *only* officers on GML 207-c status are given transitional duties, the Court, upon *de novo* review of the record, need not [and should not] accept this since it is unsupported by the record and, indeed, clearly contradicted by it. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72-74 (2d Cir. 2001). As this Court explained in *Holtz*:

> The purpose of Local Rule 56.1 is to streamline consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. The local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of lace, and a Loal Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise

15

> unsupported in the record. Where, as here, the record does
> not support the assertions in a Rule 56.1 statement, those
> assertions should be disregarded and the record reviewed
> independently.

*Id.* at 74 (citations omitted).

In *Holtz*, even though the plaintiff did not submit a responsive Rule 56.1 statement, this Court reviewed the record *de novo* and concluded that the factual assertions upon which the defendant had relied in arguing that the allegedly harassing conduct was not sexual or offensive in nature, were not supported by the record. *See Id.* Specifically, where the Rule 56.1 statement asserted that "Mumbach only touched Holtz's hand, and that none of the physical contact was 'sexual or offensive,'" this Court noted that Holtz testified that "Mumbach touched her hair as well as her hand," and that the portion of the record defendant cited did not suggest otherwise. *See Id.* Similarly, this Court noted that, while the cited testimony suggested that Holtz did not consider one aspect of Mumbach's conduct (coming close to her) to be harassing, that testimony could not support the proposition that *other* conduct, like the hand touching, was not unwanted and offensive. *See Id.* Thus, the Court disregarded these otherwise "admitted" assertions of fact.

Likewise, here, even if Paragraph 68 of Appellee's Rule 56.1 statement could be read as asserting that *only* officers on GML 207-c status were given transitional duties, such assertion is not supported by the record citations and, in fact, is contradicted by the record. Indeed, the only pages of the record Appellees cite are

16

the pages demonstrating that certain officers on 207-c status were approved for transitional duties (JA-718 [¶ 68]; JA-466-67; JA-613-14; JA-632-33; JA-663-64; JA-838). While these citations certainly establish that *these* officers on 207-c status *were* given transitional duties, they do not, alone, support the proposition that such duties are given *only* to officers on such status.

And, most critically, such assertion is belied by General Order No. 705, which expressly provides: "Upon notification by the Town's medical authority that a member of the department absent from work who has alleged a *non-line of duty injury*, or is considered sick pending LODI determination (SPL), or who has been granted official LODI status, is capable of performing certain specified modified duty, the Chief of Police may direct the employee to report to work to perform such temporary duty . . . ." (JA-1153 ¶ J(2) [emphasis added]).

Contrary to Appellees' assertion, the fact that the General Order does not mandate the provision light duty is of no moment because the same is true for each injury status – that is non-LODI, SPL and LODI. In other words, while the policy does not mandate light duty for non-LODI status, it also does not mandate it for SPL or LODI status. And since it applies in the same manner to non-LODI and LODI status, officers on each such status are similarly situated in the eyes of this policy.

Likewise, the Court need not accept Appellees' bald assertion that "[i]t was not Department practice to assign light duty to officers who did not have GML 207-

c status" and that, instead, "Department policy, in accordance with Civil Service Law § 71, is to terminate officers who are unable to perform their full duties for more than a year." *See* Resp. Br. at 33. To support this assertion, Appellees cite only the termination letters sent to Tyson. *See Id.* (citing JA-399-402). But the fact that they fired Tyson under these circumstances does not establish as a matter of law they had the policy they state. If anything, a reasonable jury could find just the opposite – that these letters reflect their policy of discrimination against Tyson because nothing in their written rules or regulations exempted Tyson from the ability to receive light duty assignments; in fact, General Order No. 705 makes clear she was eligible for such an assignment even when on non-LODI status.

Appellees' explanation about Officer 7 is somewhat confusing. *See* Resp. Br. at 34. First, in her opening brief, Tyson did focus much on Officer 7, except to point out that she observed him performing light duty assignments for several years. *See* App. Br. at 7 (citing JA-1191 ¶ 238 [incorporating JA-202-03]). Appellees do not respond to that contention, but rather focus on the fact that he was carried sick while his disability retirement application was pending and returned to work after it was denied in January 2009. *See* Resp. Br. at 34. But Appellees fail to account for the fact that Officer 7 went out again on GML 207-leave starting in November 2010 (JA-624-27; JA-1067-70). The record is unclear as to whether and when he returned to work, though his attendance records demonstrate he took many days off in 2011

18

and 2012 (JA-1074), and that, by the time of his retirement in December 2013, he had exhausted much of his contractual leave time (JA-1075-76). If anything, these attendance records seem to corroborate Tyson's assertion that she observed him performing light duty work up until his retirement (JA-202-03).

Next, Appellees fault Tyson for referencing the Americans with Disabilities Act ("ADA"), arguing that she has not asserted an ADA claim in this case and, in any event, the law does not require employers to give light duty assignments. *See* Resp. Br. at 34. But this argument is misplaced. Tyson does not cite the ADA to try to bootstrap such a claim here. Rather, she does so to point out the illogic and possible illegality of Appellees' asserted position that it has a blanket policy of providing light duty assignments only to disabled officers on GML 207-c status. In other words, the ADA requires an employer to provide reasonable accommodations to disabled employees regardless of the etiology of the injury – that is whether or not they were injured in the line of duty.

And while Appellees are correct that an employer is not required to provide a light duty assignment as an accommodation if one is not available or if same would create an undue burden, one of the very cases they cite for this proposition also recognizes that a light duty assignment *is* a proper reasonable accommodation when same is available. *See King v. Twon of Wallkill*, 302 F.Supp.2d 279, 291 (S.D.N.Y. 2004) ("Reassignment of a disabled employee to a vacant light-duty position is well

19

established as a reasonable accommodation under the ADA."). And here, the evidence shows that Appellees routinely provided light duty assignments to Caucasian male officers, suggesting that such assignments were available and that providing same to Tyson would not have caused them an undue burden. Again, Appellees point to no testimony or evidence in the record to suggest otherwise.

Finally, Appellees argue that, "even if Tyson could set forth a valid comparator and show different treatment, her claim would still fail because there is no evidence any of the individual decisionmakers were aware of the other comparators or their circumstances." *See* Resp. Br .at 35. But the races and genders of the various comparators are obvious and, absent any affirmative testimony by any of the decisionmakers disclaiming such knowledge, or any other evidence demonstrating lack of knowledge, Appellees have failed to carry their summary judgment burden of eliminating all questions of fact. In short, there are open questions that must be resolved by a jury, rendering the district court's grant of summary judgment erroneous.

## Point II

### A reasonable jury could find that s' asserted legitimate reason for firing Appellant is pretextual.

"A showing that similarly situated employees belonging to a different racial group received more favorable treatment can . . . serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job

action was a pretext for racial discrimination." *Graham v. Long Island R.R.*, 230

F.3d 34, 43 (2d Cir. 2000).

Appellees rely upon their asserted legitimate reason – that they properly

terminated Tyson under Section 71 because she was medically absent for more than

a year, and that this decision was upheld on Article 78 review. But this argument

fails to account for the underlying discrimination in their failure to provide Tyson

with light duty as discussed at length in her opening brief and above. And the Article

78 decision merely concluded that Tyson met the criteria for Section 71 termination;

it did not consider whether Appellees acted for discriminatory reasons or otherwise

evaluate whether Appellees used discriminatory means to create the conditions

leading to her continued absence, thus rendering her terminable under Section 71

(JA-56-63; 409-16). Indeed, as Judge Karas pointed out in denying Appellees'

motion to dismiss Tyson's discriminatory termination claims, the Article 78

proceeding has no collateral estoppel effect here and does not preclude a finding of

unlawful discrimination (SA-36-40).

Finally, Appellees argue in conclusory terms that "Tyson failed to show that

the Town's conduct was motivated, in whole or in part, by discrimination" and that

the "record is bereft of any showing that discrimination was a motivating factor when

the Town terminated Tyson's employment." *See* Resp. Br. at 37-38. Respectfully,

this argument fails meaningfully to respond to Tyson's demonstration that the Town

treated her substantially different from Caucasian male officers when they failed to provide her with light duty assignments, thus perpetuating her absence and rendering her terminable under Section 71. Since, as explained in her opening brief and above, these other officers are adequate comparators, a reasonable jury could infer that Tyson's termination was tainted by unlawful race and gender discrimination. *See Graham*, 230 F.3d at 43; *Austin*, 149 F.3d at 154-55.

## CONCLUSION

For all of the foregoing reasons, the judgment should be reversed and vacated and the matter remanded for trial.

Dated:     Goshen, New York
February 26, 2024

Respectfully submitted,
SUSSMAN & GOLDMAN
*Attorneys for Plaintiff-Appellant*

By:   /s/ Jonathan R. Goldman
Michael H. Sussman, Esq.
Jonathan R. Goldman, Esq.
1 Railroad Avenue, Ste. 3
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991 [Tel.]
(845) 294-1623 [Fax]
sussman1@sussman.law
jgoldman@sussman.law

**CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,369 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Time New Roman 14-point type for text and footnotes.